UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY MEEKS,

        Plaintiff,

v.

GREGORY SKIPPER, *et al.*,

        Defendants.
                                          /

Case No. 1:19-cv-161

Hon. Paul L. Maloney

### REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on a motion for summary judgment filed by defendant Corey Grahn, N.P. (ECF No. 49).

**I.     Background**

Plaintiff's claim arose from his incarceration at the MDOC's Michigan Reformatory (RMI) in Ionia, Michigan. Plaintiff's complaint named 16 defendants. The Court dismissed all defendants except for NP Grahn (referred to in the complaint as "Dr. Graham"), MDOC case worker McGillis, Corrections Office (CO) "Unknown Olsen," Unknown Party #1 ("UP#1") and Unknown Party #3 ("UP#3"). To this date, plaintiff has not identified either UP#1 or UP#3. Plaintiff alleged that he has a seizure disorder, high cholesterol, and a mental disorder, that he takes medication for each condition, and that his medications cause him to suffer from dizziness, weakness, and fatigue. Plaintiff was assigned to the fourth floor of RMI. Plaintiff was concerned that he might have a seizure and fall while walking on the stairs and spoke to Unknown

Party #3 (UP#3) at the RMI medline and NP Grahn. When plaintiff asked for a detail allowing him to stay on the ground floor, NP Grahn told plaintiff that there was no such detail at RMI.

At some point in time, plaintiff had a seizure and injured his head. Defendant CO Olsen responded and told plaintiff that he would go get help. However, no one came to help plaintiff or to check on him. The next morning, plaintiff talked to a sergeant, who called for a wheelchair to take plaintiff to health care. When plaintiff asked why no one from health care checked on him the previous night, UP#3 stated that according to CO Olsen, plaintiff refused to come to health care and that he was all right. UP#3 checked plaintiff's head and told him that it was too late to put in stitches because it had a scab. Plaintiff stated that he was still feeling dizzy. However, UP#3 said that there was nothing more she could do and ordered plaintiff to leave and climb four flights of stairs. Plaintiff felt lightheaded and almost fell on the way back to his cell.

The Court previously summarized plaintiff's other interactions with NP Grahn as follows:

> Plaintiff saw Defendant Graham on November 9, 2018, and complained about having to walk the stairs when he was at risk of having a seizure. Plaintiff became angry and called Defendant Graham a quack and said he did not want to have Defendant Graham be his doctor anymore. Defendant Graham told Plaintiff that because he was a prisoner, he did not have a right to see a different doctor, and that if Plaintiff did not see him, he would take Plaintiff off his medication. Plaintiff did not believe that Defendant Graham could take him off his medication, so he left the office.
>
> A couple of days later, Defendant Unknown Party #3 refused to give Plaintiff his medication. When Plaintiff asked why, she told him that he had been removed from the medication and that she did not know why. Defendant Unknown Party #3 told Plaintiff not to worry about it, that she would straighten it out. Subsequently, Defendant Unknown Party #3 told Plaintiff that Defendant Graham had indicated that Plaintiff signed a removal slip. . . .
>
> On December 21, 2018, Plaintiff suffered another seizure and woke up with a large knot on his head. Plaintiff went to the med-line window and told Defendant Unknown Party #3 what had happened. Plaintiff stated that he was worried about a concussion and asked for a head check and some x-rays. A couple of days later,

2

> Defendant Graham called Plaintiff to his office and told him that if he was ready to stop being an "ass," he would place Plaintiff back on his medication. Plaintiff told him to "jack off." Plaintiff continues to be without his medication and has filed several grievances, which have been rejected.

Opinion (ECF No. 4, PageID.31-32).

Plaintiff claims that NP Grahn violated his Eighth Amendment rights by (1) failing to give plaintiff a ground floor detail so he could avoid walking up and down stairs, and (2) taking plaintiff off of his seizure medication in November 2018. This matter is now before the Court on defendant Grahn's motion for summary judgment, which contends that plaintiff failed to exhaust his claims and that plaintiff's claims fail on the merits.

## II.    Defendant's motion for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of

3

> production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Lack of Exhaustion

#### 1. Exhaustion requirement

Defendant NP Grahn contends that plaintiff failed to exhaust the claims against him. The Court agrees. The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007).  In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"  *Jones*, 549 U.S. at 218.

### 2.     MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances.  *See* Policy Directive 03.02.130 (effective July 9, 2007).[1]  A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ P.  If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff.  *Id.* at ¶¶ P and R.  The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).  The prisoner must send the Step I grievance to the appropriate grievance coordinator.  *Id.* at ¶ V.  If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.  *Id.* at ¶ BB.  Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section.  *Id.* at ¶ FF.

---

[1] The Court notes that the MDOC revised its grievance policy effective March 18, 2019.  Plaintiff's grievances referenced in this report were filed in 2018 and fall under the policy effective July 9, 2007.

### 3.    Discussion

Defendant NP Grahn points out that plaintiff exhausted only one grievance which related to his claims in this lawsuit, Grievance RMI-18-04-0607-12I ("607").  *See* MDOC Step III Grievance Report (ECF No. 49-4, PageID.226-235).  This grievance relates to plaintiff's request for a ground floor detail.  However, the grievance did not name NP Grahn; rather, it involved a dispute with nurse "Jane Doe" on April 5, 2018, involving plaintiff's desire to have a special detail that exempted him from climbing stairs due to his seizures.  *See* Grievance 607 (ECF No. 49-4, PageID.288).  It appears that the "Jane Doe" in the grievance is the nurse identified as UP#3 in the complaint.  The Step I response stated that the medical provider (MP) "has not determined that the Grievance has a medical indication for a stair restriction" and that "[t]he Grievant is encouraged to address this concern with the MP and not with nursing at the medication line, or with mental health."  *Id.* at PageID.287.  Plaintiff appealed at Step II, which resulted in an investigation, and noted that plaintiff was seen by the MP on May 10, 2018, at which time the MP noted that plaintiff had "[n]o medical indication for ground floor detail."  *Id.*  The grievance was denied at Step III, at which time plaintiff was advised, "[y]our disagreement with the treatment plan does not constitute a denial of care."  *Id.* at PageID.285.

Plaintiff filed two grievances in November and December, 2018, complaining about a number of matters. The MDOC rejected both grievances.  Grievance RMI-18-11-2584-38B ("2584") contained a rambling two-page narrative which included a statement that on November 16, 2018, "I was going to take my medication and med-line I was told by both nurses that day John and Jane Doe I was taking my siezure [sic]  disorder and high cholesterol medication by Dr. Graham [sic] they said they did not why", that "[t]his was forthfully [sic] done without my authority or permission," and that "[m]e and this Doctor had several arguments my healt [sic] and

his duty to prevent a high risk of harm." Grievance 2584 at PageID.260. This grievance was rejected at Step I as "vague/illegible/extranous" [sic] because it did not identify the staff involved and "it is unclear as to what the main issue is or who you are grieving." *Id*. at PageID.262. Plaintiff was advised that "[g]rievances need to be clear and concise, as to who, what, when, where, why and how." *Id*. The grievance was rejected at Steps II and III. *Id*. at PageID.257-259.[2]

Grievance RMI-18-12-2806-28B ("2806") was dated December 21, 2018. In this grievance, plaintiff stated that he had a seizure on that date, bumped his head during the seizure, that Dr. Graham had removed plaintiff the seizure medication, that the Warden is aware of this, that it is his second injury, that he went to the med-line the next day, that they gave him some aspirin, and that he asked to be examined for an internal head injury. Grievance 2806 at PageID.239. The grievance was rejected as "vague/illegible/extranous" [sic] and plaintiff again advised to follow the rules regarding grievances. *Id*. at PageID.240. The rejection was upheld at Steps II and III. *Id*. at PageID.236-238. This record reflects that plaintiff did not exhaust either of his claims against NP Grahn.

In his response to defendant's motion, plaintiff claims that he exhausted five grievances, RMI-18-05-1037-17Z ("1037"), RMI-18-04-0635-28B ("635"), and grievances 607, 2584, and 2086. *See* Plaintiff's Response (ECF No. 55, PageID.439). As discussed, grievances 607, 2584, and 2086 are not properly exhausted. Grievance 1037 is not relevant because it is not directed against NP Grahn. *See* Grievance 1037 (PageID.283) (directed at Officer Olsen). Finally, grievance 635 was rejected because parts of the grievance were illegible. *See* Grievance 635 (PageID.294).

---

[2] The Court notes that while this grievance was rejected for failing to provide basic information, plaintiff was aware of how to file an appropriate grievance. The MDOC Step III Grievance Report indicates that plaintiff had filed 36 grievances prior to November 26, 2018, the date he filed this grievance. PageID.226-235.

Plaintiff has failed to properly exhaust the claims against NP Grahn. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendant Grahn is entitled to summary judgment on the claims alleged in plaintiff's complaint.

### C.    **Eighth Amendment claim**

### 1.    **Legal standard**

As discussed, plaintiff did not properly grieve his two claims against defendant Grahn. However, even if plaintiff had properly exhausted the claims against N.P. Grahn, his claims fail on the merits. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does

not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 2. Plaintiff's medical treatment

Defendant NP Grahn also seeks summary judgment on the merits of plaintiff's claims. In this regard, defendant filed 111 pages of plaintiff's medical records generated between March 27, 2017 and August 20, 2019. *See* Medical Records (ECF No. 51). These records document plaintiff's longstanding history of failing to get his medication from the health care staff, refusing to take his medication, refusing blood draws to monitor his medication, and staff's efforts to encourage plaintiff to comply with his medical treatment. Plaintiff transferred to RMI on March 28, 2017. PageID.314. At that time, the MDOC prepared a summary of plaintiff's medical records from the transferring facility. The summary includes a record of plaintiff's lengthy history of refusing medication and blood draws since at least 2015.[3]

---

[3] Plaintiff's medical records prior to his transfer to RMI include the following notes: 8/27/15 (plaintiff refused all Zocor and 33 doses of Dilantin this month); 12/15/15 (plaintiff noncompliant with Dilantin); 1/20/2016 (plaintiff

After plaintiff arrived at RMI, his medical records document plaintiff's refusal to take prescribed medication, his refusal to take lab draws, and health care staff's efforts to encourage plaintiff to cooperate in maintaining his health: 4/10/17 (plaintiff refused 4 consecutive doses of Zocor); 4/11/17 (plaintiff refused 4 consecutive doses of Trazodone and Remeron; 4/11/17 (NP Grahn will address plaintiff's refusal to take Zocor at next meeting and consider a right of refusal "ROR" form); 4/18/17 (plaintiff refuses Remeron every day, has refused Trazodone past 12 of 15 doses); 5/12/17 (plaintiff refused 8 doses of Remeron, 8 doses of Trazadone, and 8 doses of Zocor over past 11 days); 5/16/207 (NP Grahn chart update on plaintiff's refusal to take Zocor); 5/17/17 (plaintiff cancelled lab appointment for third time, MP notified); 5/17/17 (NP Grahn chart update on plaintiff's refusals to have lab work done); 5/24/17 (chronic care visit with NP Grahn, noting that plaintiff is 80-90% compliant with seizure medication, that he had 1 unreported seizure in past 6 months, that plaintiff was noncompliant with hyperlipidemia medication but now agrees to take meds and get labs); 6/21/17 (plaintiff refused Zocor, Dilantin, and Keppra 6 consecutive days); 6/22/17 (NP Grahn chart update regarding plaintiff's refusal to take medication); and, 7/5/17 (NP Grahn saw plaintiff for followup on labs taken). PageID.317-335, 338-343.

Plaintiff was transferred to the Gus Harrison Correctional Facility (ARF) on July 6, 2017. *See* Medical Records PageID.345. Plaintiff's medical records from ARF reflect his practice of refusing to take medication and lab tests, despite staff's advice that refusing his medication included risks including death. While at ARF, plaintiff went on a hunger strike, refused

---

missed 21 doses of Dilantin this month); 2/20/2016 (plaintiff has only appeared for a.m. and p.m. meds 6 times this month); 5/15/16 (plaintiff missed 8 doses of Remeron and 5 doses of Prozac this month); 5/17/2016 (plaintiff missed 13 of 28 doses of Dilantin this month); 6/3/2016 (plaintiff missed/refused meds for 4 consecutive days); 7/11/16 (plaintiff refused blood draw); 1/23/17 (plaintiff refused Simvastatin 8 times at medline and been a no show at medline 3 times this month); 1/24/17 (plaintiff refused Remeron and Trazadone 8 times at medline and is noncompliant); and, 2/7/2017 (plaintiff missed 3 consecutive doses of Trazondone, Remeron, and Zocor). *See* Medical Records at PageID.315-316.

10

to take medication, and refused food strike medical evaluations even though he agreed to have the evaluations.[4]

Plaintiff was transferred back to RMI on February 6, 2018. PageID.370. Upon his return, plaintiff continued his pattern of refusing to take medication and refusing to cooperate with medical personnel: 2/20/18 (plaintiff refused last three doses of Dilantin, Zocor and Buspar with no reasons given); 2/21/18 (NP Grahn noted that plaintiff presented with refusal for medication, treatment, screening and evaluation); 2/23/18 (plaintiff refused Buspar last 8 consecutive doses); 2/23/18 (plaintiff refused Keppra, Dilantin and Zocor last 4 consecutive days); 2/22/18 (NP Grahn noted plaintiff's refusal to take medication); 4/11/18 (in scheduling a visit regarding plaintiff's request for a ground floor room due to seizures, Dr. Howard noted that there "appears a lot of noncompliance"); 4/13/18 (plaintiff's refusal to take doses of Dilantin); 4/15/18 (plaintiff arrived in health care and refused to be evaluated because he was "fasting to meditate"); and, 4/16/18 (NP Grahn noted plaintiff's refusal to take Dilantin and Zocor over the "past few days"). PageID.372-384.

On April 16, 2018, NP Grahn visited plaintiff's cell because plaintiff refused to come to health care for a hunger strike evaluation. PageID.386. At that time, plaintiff advised NP Grahn that he was "on a religious fast and not a hunger strike", that he had a seizure last week, that he was afraid of falling down the stairs, and that he wanted a ground floor detail. *Id*. NP Grahn

---

[4] At a chronic care visit on August 3, 2017, plaintiff was advised of the risks and consequences of refusing medication, including possible death. Medical Records at PageID.348-351. Nevertheless, plaintiff refused a lab draw on August 10, 2017, and on August 14, 2017, the MP noted that plaintiff was "refusing all medications." PageID.352-353. Plaintiff went on a hunger strike in December 2017; however, an attempted evaluation on December 18th was minimal, because plaintiff would not come to the cell door, have his vital signs taken, or answer medical questions. PageID.354-356. The MP advised plaintiff "that if he doesn't drink and doesn't take his anti seizure meds, then he is more likely to have a seizure." PageID.356. Plaintiff refused another hunger strike evaluation on December 20th. PageID.359. On December 25th, plaintiff refused another evaluation; healthcare noted that plaintiff was refusing all meds, food, and treatment. PageID.360. Plaintiff agreed to have a post-hunger strike evaluation on December 28, 2017, but refused another evaluation on January 2, 2018. PageID.361-364. Plaintiff refused a lab draw on January 28, 2018. PageID.369.

11

advised plaintiff that it was no longer MDOC policy for seizure patients to have a ground floor SAN (special accommodation notice) and that it was not medically indicated in his case. PageID.386-387.

On April 22, 2018, when health care personnel were passing out medication, plaintiff reported that an unnamed nurse forgot to give him seizure meds and that he had a seizure at 2:00 a.m. that morning. PageID.388. After RN Bowker reminded plaintiff "that he refused his Dilantin for over a week," plaintiff agreed that "he should now take it as ordered." *Id*.

Despite this agreement, plaintiff continued to refuse medication and lab tests: 4/30/18 (plaintiff refused all labs); 4/30/18 (NP Grahn noted plaintiff's refusal of all labs); 5/9/18 (NP Grahn noted that plaintiff refused 3 consecutive noon doses of Dilantin); 5/10/18 (at annual health screen, NP Grahn noted that plaintiff is intermittently refusing Dilantin, plaintiff said he is afraid of falling down stairs, NP Grahn encouraged plaintiff to take Dilantin as prescribed and "advised he is at increased risk for another seizure and possible death if he doesn't");  5/28/18 (officer called to relay plaintiff's message that "I had a seizure," however, plaintiff refused to speak with RN Waber on the phone and also refused to go to healthcare); 5/29/18 (plaintiff went to healthcare stating he had dizziness, blurred vision, a seizure and gashed his head open, plaintiff was examined and sent back to room with instructions to drink fluids and be compliant with medications and labs); 7/17/18 (plaintiff refused 8 doses of Dilantin and 5 doses of Zocor in past 17 days);  7/21/18 (plaintiff stated he had a seizure last night and was tired and dizzy); 7/23/18 (NP Grahn noted plaintiff's refusal to take medication and nurse notes from 7/21/18); 10/1/18 (plaintiff refused to take Dilantin); 10/3/18 (NP Grahn noted plaintiff's refusal to take Dilantin); 10/23/18 (plaintiff refused labs); 11/5/18 (plaintiff refused 6 doses of Dilantin and 3 doses of

Zocor); and, 11/7/18 (NP Grahn noted plaintiff recent refusals to take Dilantin and Zocor). PageID.389-396, 400-418.

Plaintiff's refusal to cooperate with health care staff culminated on November 14, 2018. On that date, plaintiff came to health care for a scheduled MP visit but refused to see NP Grahn. PageID.418-419. Upon review of plaintiff's chart, NP Grahn noted that plaintiff has "refused monitor labs" and "refused 9 doses of Dilantin so far this month." PageID.418. NP Grahn assessed plaintiff with "Refusal of treatment." PageID.419. NP Grahn provided the following comments:

> Therefore since pt refuses to see MP x 2 attempts, refusing monitor labs and refusing indicated medications at RML [sic] provider will discontinue Zocor and Dilantin as risks outweigh potential benefits. ROR signed last week. Pt. may kite if wishes to be compliant with treatment plan.

PageID.419. Plaintiff filed the present lawsuit on March 4, 2019.

### 3. Discussion

Plaintiff claims that NP Grahn was deliberately indifferent to his serious medical needs for failing to give plaintiff a ground floor detail and cancelling his seizure medication (Dilantin). NP Grahn addressed both of plaintiff's claims in his affidavit, which is consistent with the medical records. *See* NP Grahn Aff. (ECF No. 49-3). With respect to plaintiff's claim for a ground floor detail, NP Grahn stated:

> On May 10, 2018, Mr. Meeks presented for a scheduled provider visit. HUM Derren was present during the encounter. I noted Mr. Meeks was intermittently refusing his Dilantin. I encouraged Mr. Meeks to take his Dilantin as prescribed and advised Mr. Meeks that he was at an increased risk for another seizure and possible death. I noted Mr. Meeks had refused his labs to monitor his hyperlipidemia and was noncompliant with his Lipitor. I informed Mr. Meeks that there was no medical indication for ground floor detail. Mr. Meeks became argumentative and terminated the visit prior to the physical examination. I renewed Mr. Meeks's Zocor and Dilantin prescriptions and ordered a follow up visit in six months.

NP Grahn Aff. at PageID.223-224.

With respect to the decision to discontinue the Dilantin prescription, NP Grahn stated:

> On November 14, 2018, Mr. Meeks presented for a scheduled provider visit. Mr. Meeks came to health care to [sic] refusing to be seen. I noted he refused his monitoring labs, and nine doses of Dilantin this month. After he had refused his last two visits, I used my medical judgment to discontinue his Zocor and Dilantin as the risks of taking the medication outweighed the potential benefits. I explained if he wished to be compliant with his treatment plan, he could submit a kite. This was NP Grahn's last interaction with Mr. Meeks.

*Id.* at PageID.224. While plaintiff alleged that he had a heated argument with NP Grahn sometime after December 21, 2018 ( *i.e.*, NP Grahn called plaintiff to his office, told plaintiff that he would place plaintiff back on the medicine if plaintiff would stop being an "ass," and plaintiff told Grahn to "jack off"), there is no evidence that this heated argument occurred.

Plaintiff contends that genuine issues of material fact exist due to the evidence presented in a declaration, which re-states and amplifies some of the allegations in his complaint. *See* Plaintiff's Decl. (ECF No. 57).  For example, plaintiff stated: that he could not go to the medline to take his seizure medication because of his mental condition and his "chronic seizure disorder," which made it hard for him to get out of bed and to walk down four flights of stairs. PageID.450-453.  Plaintiff stated that he cannot take blood draws because he is scared of needles, but he can give blood twice a year to monitor his seizure disorder.  *Id*. Plaintiff appears to blame his living situation on the Warden's administrative assistant, who turned down his ADA accommodation for a ground floor room.[5]  PageID.451.  Finally, contrary to NP Grahn's affidavit and the medical records, plaintiff stated that he went for scheduled visits with NP Grahn after November 14, 2018, but that "all they did was argue" and  "NP Grahn refuse[d] to put plaintiff

---

[5] The Court notes that the administrative assistant was dismissed on initial screening.

14

back on his medication." PageID.453. Plaintiff's declaration does not rebut the matters set forth in NP Grahn's affidavit because the declaration did not comply with the requirements of an unsworn declaration under 28 U.S.C. § 1746.[6] Furthermore, plaintiff's statements set forth in the declaration cannot create a genuine issue of material fact on summary judgment because the statements are based upon "information and belief."[7]

The record reflects that NP Grahn, like plaintiff's other health care providers and nurses, was in a constant struggle with plaintiff to encourage him to take his medication and to cooperate with his health care plan. While plaintiff claims that NP Grahn was deliberately indifferent to his serious medical needs, plaintiff does not address his actual medical needs as reflected in his medical history: that he had few documented seizures; that he refused to speak with medical personnel on multiple occasions; that he refused medication and lab draws; and, that he was advised on numerous occasions to take his seizure medication or face risks including seizures and possible death. Plaintiff's claim that his seizures made him so tired and dizzy every day that he could not take the medication to prevent those seizures is "blatantly contradicted by the record" and "no reasonable jury could believe it." *See Scott*, 550 U.S. at 380.

---

[6] To qualify as an unsworn declaration under that statute, a statement must be made in substantially the following form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)". 28 U.S.C. § 1746(2). Here, plaintiff's statements did not comply with the statute. He did not verify that the statements were "true and correct;" rather, plaintiff diluted the language to state that his "answers and response" to defendant's motion "are trued and correct to the best of my knowledge[,] information and belief." PageID.450.

[7] A party's statement made "to the best of my knowledge, information and belief" does not demonstrate personal knowledge and cannot create genuine issues of fact for purposes of a summary judgment motion. *Kiplinger v. Selene Finance, LP*, No. 1:15-cv-105, 2015 WL 9255564 at *3 (W.D. Mich. Dec. 18, 2015). *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (holding that the affiant's "statement . . . based upon his 'belief'. . . did not demonstrate the personal knowledge required by Fed. R. Civ. P. 56(e)"); *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (the "personal knowledge requirement [of Rule 56] prevents statements in affidavits that are based, in part, 'upon information and belief' – instead of only knowledge – from raising genuine issues of fact sufficient to defeat summary judgment"); *Dellacava v. Painters Pension Fund of Westchester and Putnam Counties*, 851 F.2d 22, 27 (2d Cir. 1988) (statements in an affidavit made "upon information and belief" have "no probative value and may not be considered in a motion for summary judgment").

Based on this record, plaintiff has failed to meet the subjective prong of a deliberate indifference claim. There is no evidence that NP Grahn ignored plaintiff's medical condition or exhibited "obduracy and wantonness" in treating him. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). Plaintiff's disagreement with his physicians over the proper course of treatment "alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

Furthermore, it is abundantly clear from the medical record that plaintiff refused to cooperate in his own medical care. Plaintiff cannot claim that medical providers were deliberately indifferent to his serious medical needs when he himself refused to attend to those needs by refusing to take medication, refusing to participate in lab draws to monitor his medication, refusing to attend healthcare appointments, and disrupting medical visits with confrontational behavior.

> A voluntary refusal of treatment precludes an Eighth Amendment claim. *Palmer v. Wagner,* 3 Fed. App'x 329, 331 (6th Cir. 2001). Prison officials are not deliberately indifferent to a prisoner's serious medical needs when the prisoner refuses to accept medical treatment. *See, e.g., Richard v. Bokor*, 379 Fed. Appx. 719, 720–22 (10th Cir. 2010) (prisoner failed to state a claim for deliberate indifference where he thwarted medical personnel's efforts by disrupting the medical visits and refusing the offered treatment)[.]

*Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428 at *4 (W.D. Mich. March 7, 2016). For all of these reasons, defendant NP Grahn's motion for summary judgment should be granted.

### III.    Unknown parties

As discussed, plaintiff never identified two unknown parties, UP#1 and UP#3. An unknown party or "Doe" defendant listed in a complaint is not a party to a lawsuit. Rather, "Doe defendants are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed." *Hindes v. FDIC*, 137 F.3d 148, 155 (3rd Cir. 1998) (internal quotation and citation omitted). Plaintiff has not identified the unknown parties. Discovery is closed. Accordingly, plaintiff's claims against UP#1 and UP#3 should be dismissed.

### IV.    Recommendation

Accordingly, I respectfully recommend that defendant NP Grahn's motion for summary judgment (ECF No. 36) be **GRANTED**, that Unknown Party #1 and Unknown Party #3 be **DISMISSED**, and that this case proceed against defendants McGillis and Olsen.

Dated:  July 30, 2020                                  /s/ Ray Kent
                                                       United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).